UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Monclova Christian Academy, *et al.*,                    Case No. 3:20-cv-2720

            Plaintiffs,

    v.                                                                                     MEMORANDUM OPINION
                                                                                               AND ORDER

Toledo – Lucas County
Health Department,

            Defendant.

## I.    INTRODUCTION

Plaintiffs Monclova Christian Academy, St. John's Jesuit High School & Academy, Emmanuel Christian School, and Citizens for Community Values, doing business as the Ohio Christian Education Network ("OCEN") (collectively, "Plaintiffs"), filed suit against the Toledo – Lucas County Health Department ("TLCHD"), challenging a resolution passed by TLCHD on November 25, 2020, which prohibits schools from providing in-person instruction to certain grade levels or allowing sports programs and extracurricular groups to utilize facilities within a school building from December 4, 2020, at 4:00 p.m. until January 11, 2021, at 8:00 a.m. (the "TLCHD Resolution"). (Doc. No. 1). Plaintiffs contend the TLCHD Resolution violates the Free Exercise Clause and infringes upon Plaintiffs' civil rights. (*Id.* at 23-25).

Plaintiffs have filed a motion seeking a temporary restraining order and a preliminary injunction prohibiting the TLCHD from enforcing the TLCHD Resolution and "allow[ing] in-

person learning and extracurricular activities to continue in religious school buildings." (Doc. No. 2 at 1). Defendant filed a brief in opposition. (Doc. No. 5). On December 8, 2020, I held a telephone conference with counsel for the parties and a court reporter. During that conference, the parties agreed there is no need for an evidentiary hearing with respect to Plaintiffs' request for a temporary restraining order. At the end of the conference, I granted Plaintiffs' request for leave to file a reply memorandum. Plaintiffs filed their brief in reply and request for oral argument on December 10. (Doc. No. 7). Having reviewed the parties' well-considered arguments in their briefs, I conclude oral argument is not necessary, and deny Plaintiffs' request.

For the reasons stated below, I deny Plaintiffs' motion for a temporary restraining order.

## II. BACKGROUND

A year like none in recent history promised a school year unlike any other. In March of 2020, as Ohio saw its first confirmed cases of Covid-19, Ohio Governor Mike DeWine ordered all schools in Ohio to cease in-person instruction beginning on March 16, and to provide all students with their schoolwork through an internet platform (a method which became known as a virtual model).[1] The closure order, which initially was for a period of three weeks, eventually extended through the balance of the 2019-2020 school year.[2]

School systems and county health departments spent the summer months developing safety protocols for students and staff, including mandatory mask-wearing, social distancing, strict monitoring of symptoms consistent with Covid-19, isolation periods for those with known

---

[1] https://governor.ohio.gov/wps/portal/gov/governor/media/news-and-media/announces-school-closures

[2] https://www.cleveland.com/coronavirus/2020/04/ohio-k-12-schools-closed-the-rest-of-the-school-year-gov-mike-dewine-says.html

infections and quarantine periods for those exposed to known infections, and the reporting by school systems of data on the numbers of known infections and those in quarantine.[3]

While, in early August, the TLCHD recommended schools begin the 2020-2021 school year in a virtual learning model, the TLCHD also allowed both public and private schools to propose and follow individualized plans for educating students while following public-health guidelines.[4] St. John's, which began in-person instruction on July 27, 2020, continued doing so. Emmanuel Christian began in-person instruction on August 19. Many other schools within Lucas County followed suit, though others adopted a part in-person / part virtual "hybrid" model.[5]

In the fall of 2020, like many counties in Ohio, Lucas County began to see an increase in the overall number of confirmed Covid-19 infections, as well as in the number of hospital admissions, emergency room visits, ventilators used, and outpatient visits necessitated by Covid-19 cases. Schools in Lucas County felt the strain of these increases, as rising numbers of infections affecting both staff and students caused several districts within Lucas County to move their classes from an in-person or a hybrid model to a fully-virtual model.[6]

Other school systems, including the Plaintiff-schools, were able to continue providing in-person instruction. The Plaintiff-schools allege they have had particular success in following public-health protocols to limit or prevent the spread of Covid-19 among their school populations. As of

---

[3] https://www.dispatch.com/story/news/local/2020/06/29/ohio-school-reopening-guidelines-will-be-flexible-dewine-says/112798046/

[4] *See* https://www.toledoblade.com/local/education/2020/08/06/toledo-lucas-county-health-board-recommends-remote-learning-coronavirus/stories/20200806133 (last accessed December 9, 2020).

[5] https://www.13abc.com/2020/08/06/lucas-co-schools-recommended-to-go-virtual-by-health-board/

[6] https://www.toledoblade.com/local/education/2020/11/09/tps-to-return-to-full-virtual-learning-as-pandemic-worsens/stories/20201109125

the drafting of the Complaint, St. John's had reported only 13 students and 6 faculty and staff members tested positive during the 77-day period in which St. John's has provided in-person instruction, while Emmanuel Christian had reported 10 students, 1 faculty member, and 1 volunteer tested positive during their 68-day period of in-person instruction.[7] (*Id.* at 17, 22). Both schools state none of these infections was the result of transmission or spread within the school buildings.

As cases increased in Lucas County, however, the TLCHD also began looking ahead. The TLCHD noted there had been few cases documented of in-school transmission of Covid-19 within Lucas County schools, but also noted "as community spread increases[,] so does the risk for transmission of COVID within schools." (Doc. No. 1-3 at 1). As of the date of the TLCHD Resolution, the average number of daily cases within Lucas County exceeded 230 and the percentage of positive test results from the community was between 15 and 20%. (*Id.*). Both of these data points exceeded the Center for Disease Control's highest-risk indicators of 200 or more daily cases and a positivity rate of 10% or greater. (*Id.*). Moreover, Lucas County had more than 500 cases per 100,000 residents, over 5 times the CDC's high-incidence population rate of 100 cases per 100,000 residents. (*Id.*).

Citing data concerning a lag in receiving testing results for suspected Covid-19 cases, the attendant delay in beginning contact tracing of individuals who test positive, and "a noted increase in disease within the community . . . starting 7-10 days following observed holidays," the TLCHD concluded the anticipated continued increase driven by community spread and the upcoming Thanksgiving, Christmas, and New Year's holidays foreshadowed a "significant burden of new cases" within Lucas County. (Doc. No. 1-3 at 1-2). The TLCHD decided greater restrictions were necessary to "mitigate the potential increase of COVID cases in our schools and our community." (*Id.*).

---

[7] Plaintiffs do not provide similar information for Monclova Christian.

On November 25, 2020, TLCHD ordered, pursuant to Ohio Revised Code § 3707.26:

> All Lucas County Schools, including public, private, charter[,] and parochial schools . . . [to] close all school buildings from December 4, 2020 at 4:00 pm to January 11, 2021 at 8:00 am. . . . Due to anticipated issues with students in grades K-6 (unless the school configuration is grades K-8 who can follow K-6 orders), schools may remain open but may only open those facilities required to provide in-person education for students in those grades. . . .
>
> Schools may open to hold religious educational classes or religious ceremonies. Education for Grades 7-12 (or 9 to 12 depending on school configuration) will be virtual from December 4th until January 11th. All school buildings may open to hold exams, [to permit] staff to provide virtual instruction and for special needs education requiring in person instruction. These dates were chosen to limit the number of times students will need to switch between virtual and in-person learning models due to holiday breaks that schools have already scheduled.

(Doc. No. 1-3 at 3). The TLCHD Resolution also prohibited "all sports and extracurricular activities . . . from utilizing any school building interior space for practice or contests during this same period." (*Id.*).

Plaintiffs do not challenge the TLCHD's statutory authority to enter the TLCHD Resolution. They contend, however, that the TLCHD Resolution impermissibly burdens their religious freedoms.

### III. STANDARD

The movant bears the burden of demonstrating that a temporary restraining order is warranted under Fed. R. Civ. P. 65(b). *See Jane Doe v. Barron*, 92 F. Supp.2d 694, 695 (S.D. Ohio 1999). In determining whether to issue a temporary restraining order or a preliminary injunction, I must examine and weigh the following four factors: (1) whether the moving party has shown a strong likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction. *Overstreet v. Lexington–Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002); *McPherson v. Michigan High School Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (*en banc*).

### IV.     ANALYSIS

#### A.     OVERTLY-DIFFERENT TREATMENT OF RELIGION

The First and Fourteenth Amendments prohibit state government from making laws "respecting an establishment of religion, or prohibiting the free exercise thereof[.]" U.S. Const. amend. I; *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) ("The First Amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. The Fourteenth Amendment has rendered the legislatures of the states as incompetent as Congress to enact such laws."). The Free Exercise Clause "protects religious observers against unequal treatment" and prohibits the State from "penaliz[ing] religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Espinoza v. Montana Dep't of Rev.*, 140 S.Ct. 2246, 2254-55 (2020) (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S.Ct. 2012, 2021 (2017), and *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 449 (1988)).

It is well-settled, however, that the Free Exercise Clause does not shield any and all religious practices from falling within the ambit of government regulation. While laws which target "religious beliefs as such [are] never permissible," *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993), the Supreme Court's Free-Exercise jurisprudence adheres to "the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Id.* at 531. Laws which fail to "satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Id.* at 531-32. This standard of justification is commonly referred to as "strict scrutiny."

Plaintiffs begin with the presumption that strict scrutiny applies – that TLCHD must choose the "least restrictive, constitutionally-inoffensive way of controlling community spread." (Doc. No. 1

6

at 6). They do so, however, by shifting focus to their felt burden and away from the plain language of the TLCHD Resolution. Plaintiffs assert, for instance, that "[t]he terms of the Resolution are clear: *all* in-person schooling at *parochial* schools for Grades 7-12 (or 9-12 depending on school configuration) must end regardless of whether the *parochial* school is taking safety precautions, practicing social distancing, or implementing appropriate hygiene standards. At the same time, other secular activities and in-person schooling at *parochial* schools through K-6 (or K-8 depending on school configuration) are not prohibited." (Doc. No. 1 at 23 (all emphases added except first)).

While the TLCHD Resolution treats grade levels differently, it does so for all schools. It does not "single out" parochial schools for harsher treatment than secular schools receive.[8] *Roman Catholic Diocese of Brooklyn v. Cuomo*, --- S. Ct. ---, 2020 WL 6948354, at *1 (Nov. 25, 2020). The TLCHD Resolution expressly applies to "[a]ll Lucas County Schools, including public, private, charter[,] and parochial schools . . . ." (Doc. No. 1-3 at 3). The TLCHD's "reasons for suspending in-person instruction apply precisely the same" to all schools in Lucas County. *Commonwealth of Ky. v. Beshear*, --- F.3d ---, 2020 WL 7017858, at *3 (6th Cir. Nov. 29, 2020). Therefore, strict scrutiny does not apply.

The nature of Plaintiffs' arguments stems in part from their assertion that the educational courses they offer to their students are inextricably intertwined with their religious beliefs and, therefore, to prohibit Plaintiffs from holding classes in the manner in which they believe is most consistent with the tenets of their faith is to interfere with the free exercise of their faith. (*See, e.g.,* Doc. No. 2 at 8 ("[T]he Resolution prohibits Plaintiffs from educating their children according to the tenets of their faith. . . . Providing religious education is a core part of the religious freedom protected by the First Amendment, and TLCHD's Resolution plainly burdens such freedom.")).

---

[8] Instead, as I noted above, the only express reference to religion is the carve-out permitting schools to "open to hold religious educational classes or religious ceremonies." (Doc. No. 1-3 at 3).

The Sixth Circuit recently addressed this line of argument while considering a substantially-similar school closure order issued by the Governor of Kentucky, making clear that a plaintiff's "'sincerely held religious belief' regarding in-person schooling . . . is not determinative where there is a neutral rule of general applicability, as there is here . . . ." *Commonwealth v. Beshear*, 2020 WL 7017858, at *2 (citing *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872 (1990)).

Plaintiffs attempt to distinguish *Commonwealth v. Beshear* by arguing there are "critical difference[s]" between the Kentucky Governor's order and the TLCHD Resolution and that Plaintiffs' allegations are different from those made by the plaintiff-school in *Commonwealth v. Beshear*. (Doc. No. 7 at 5-9). Plaintiffs argue that, as a result of these differences, the Sixth Circuit's decision in that case is not dispositive of Plaintiffs' claims. (*Id.*). I do not find these arguments persuasive.

First, I have treated *Commonwealth v. Beshear* as persuasive, rather than binding, authority. The Sixth Circuit applied Supreme Court and Circuit precedent to the facts of the case before it in order to reach its conclusion about the likelihood the plaintiffs in that case would succeed on the merits of their claims. I have independently done the same.

Next, while Plaintiffs point out that the Governor, and not a health department, ordered the closure of Kentucky schools, this is irrelevant. As Plaintiffs acknowledge, the TLCHD has the statutory authority under Ohio Revised Code § 3707.26 to order schools to close, and the TLCHD does not need to wait for Governor DeWine or another county health department to act. (*See* Doc. No. 7 at 6). Nor is it relevant that the TLCHD Resolution did not specifically cite a statewide State of Emergency. (*Id.*). Section 3707.26 neither explicitly nor implicitly contains such a requirement.

Further, the alleged "substantive[]" differences between the Kentucky order and the TLCHD Resolution are no more than technical. (Doc. No. 7 at 7-8). Plaintiffs do not explain why the Kentucky order could be found valid because it ordered virtual schooling beginning at grade 6 but the TLCHD Resolution is invalid because it begins with grade 7 or 9. (*Id.*). While Plaintiffs note

8

Kentucky schools "may provide group in-person targeted services," (*id.*) they neither identify the content of this terminology nor do they acknowledge the specific exceptions in the TLCHD Resolution permitting school buildings to be open for exams and "for special needs education requiring in person instruction."  (Doc. No. 1-3 at 3).  Plaintiffs also do not explain why the prohibition on the use of school buildings for sports or extracurricular activities renders the TLCHD Resolution invalid by comparison to the Kentucky order.  (Doc. No. 7 at 7).

Finally, Plaintiffs' argument that their complaint contains allegations not contained in the complaint in *Commonwealth v. Beshear* also falls short.  Plaintiffs identify only one difference specifically addressing the free exercise of religion – "Plaintiffs' Verified Complaint specifically explains that faith-based instruction is an 'act of worship,' while the Danville Complaint merely suggests that faith-based instruction is a religious calling."  (Doc. No. 7 at 8).  I already have noted that Plaintiffs' sincerely-held religious belief "is not determinative where there is a neutral rule of general applicability, as there is here, any more than it would have been determinative in *Smith*, 494 U.S. 872 . . . ."  *Commonwealth v. Beshear*, 2020 WL 7017858, at *2.

These allegedly "critical difference[s]" are merely distinctions without a difference and do not undermine the facial neutrality or general applicability of the TLCHD Resolution.

### B.  IMPLICITLY-DIFFERENT TREATMENT OF RELIGION

It of course is true that a facially neutral and generally applicable law in practice may discriminate against religious activity "due to exceptions for comparable secular activities."  *Roberts v. Neace*, 958 F.3d 409, 413 (6th Cir. 2020).  The TLCHD Resolution, however, contains no such exceptions.  To the contrary, any exception contained in the Resolution which treats secular and religious activities differently offers <u>greater</u> protections for religious activities.  (*See, e.g.,* Doc. No. 1-3 at 3 ("Schools may open to hold religious educational classes or religious ceremonies.")).

9

Plaintiffs argue "operating a 'private religious school' is not a distinct venture that courts can analytically separate from worship or other aspects of religious exercise." (Doc. No. 2 at 8 (citation omitted)). Because their educational mission is like a worship service, Plaintiffs argue, the TLCHD Resolution has the practical effect of "treat[ing] worship services differently from other activities that involve extended, indoor gathering of large groups of people." *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2605 (2020) (Alito, J., dissenting).

While, as Plaintiffs note, TLCHD has not ordered gyms, tanning salons, or casinos to close, (Doc. No. 1 at 5-6), these are not the relevant "comparable secular activities." Instead, the comparable secular activities are educational classes offered by all other schools in Lucas County. These specific environments have substantially similar groupings and movements of individuals. Emmanuel Christian, St. John's, and Monclova Christian are prohibited from offering in-person instruction to grades 9-12 (or grades 7-12) along with all other Lucas County schools "because the reasons for suspending in-person instruction apply precisely the same to them." *Commonwealth v. Beshear*, 2020 WL 7017858, at *3. The TLCHD's decision to address schools specifically and not a larger universe of public and social activities "in no way correlate[s] to religion." *Id.*

Moreover, the fact that the TLCHD Resolution impacts the Plaintiffs' sincerely held belief in the necessity of integrating educational instruction and face-to-face interaction does not mean that the Plaintiffs' religious practices are unduly burdened by the TLCHD Resolution. The biblical principles Plaintiffs point to are not limited in their application. As Plaintiffs say, these principles are to guide all of a Christian's life, not just the portion spent during the compulsory school years. (*See, e.g.,* Doc. No. 2 at 3 ("Consistent with 1 Thessalonians 5:17 ("pray without ceasing"), prayer is a regular part of Monclova Christian's school day, whether in classes, chapel services, or interacting with students in the hallways or classrooms."); *id.* ("Monclova Christian makes every effort to point students to a dependency on Christ in every situation in life, whether that situation is intellectual or

interpersonal."); *id.* at 7 ("The act of worship (or engaging in physical or mental acts to honor God) takes many forms beyond singing songs in the assembled company of other believers.")).

Plaintiffs' arguments, therefore, would extend to prohibit the government from regulating any aspect of a Christian's public life because, as Plaintiffs' mission statements make clear, the purpose of providing "a biblical foundation for . . . students" is to prepare students "to exemplify Christ [and] make Biblically-based decisions" throughout an individual's life, and not only during the schools years. Thus, a Christian business would be exempt from minimum wage and maximum hour laws,[9] while Christians in states where officials have issued Covid-19-related orders closing restaurants for in-person dining could not be prohibited from gathering to share a meal in one of those restaurants.[10]

More closely to the issue at stake in this case, Plaintiffs' arguments would mean States could not mandate that students attending parochial schools receive the equivalent number of hours required of public-school students or require that parochial schools provide courses in specific subjects. *See* Ohio Rev. Code § 3321.07 ("If any child attends upon instruction elsewhere than in a public school such instruction shall be in a school which conforms to the minimum standards prescribed by the state board of education. The hours and term of attendance exacted shall be equivalent to the hours and term of attendance required of children in the public schools of the district.").

While Plaintiffs may respond that those types of governmental restrictions fall outside the parties' dispute in this case, the religious-freedom principles underlying Plaintiffs' arguments here are subject to the same countervailing limitations. *Cf. Smith,* 494 U.S. 872 (Oregon statute criminalizing

---

[9] "Whatever you do, work heartily, as for the Lord and not for men." Colossians 3:23 (ESV).

[10] "So, whether you eat or drink, or whatever you do, do all for the glory of God." 1 Corinthians 10:31 (ESV).

possession of a controlled substance did not violate the Free Exercise rights of respondents who ingested peyote as part of a religious ceremony because the challenged law was neutral and generally applicable); *United States v. Lee*, 455 U.S. 252, 254 (1982) (The Free Exercise Clause does not prohibit the government from requiring that taxpayers pay Social Security taxes even "when [the] payment of taxes and receipt of benefits violate[s] the taxpayer's religion.") A religious institution's sincerely held beliefs, including beliefs about the best way to fulfill the institution's mission, do not provide the institution with "a general immunity from secular laws." *Commonwealth v. Beshear*, 2020 WL 7017858, at *3 (quoting *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, --- U.S. ---, 140 S. Ct. 2049, 2060 (2020)); *see also Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2012) ("[P]ublic authorities may enforce neutral and generally applicable rules and may do so even if they burden faith-based conduct in the process.").

While Plaintiffs do not expressly invoke the ministerial exception,[11] they rely heavily on the Supreme Court's decision in *Our Lady of Guadalupe School*. (*See* Doc. No. 2 at 7-8). In that decision, the Supreme Court held a court could not adjudicate the employment disputes between the schools and teachers involved in the two cases before the Court, noting "[t]he religious education and formation of students is the very reason for the existence of most private religious schools, and therefore the selection and supervision of the teachers upon whom the schools rely to do this work lie at the core of their mission." *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2055.

While the Court "recognized the 'close connection that religious institutions draw between their central purpose and educating the young in the faith,'" (Doc. No. 2 at 8 (quoting *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2066)), this case does not involve an internal dispute between the

---

[11] The ministerial exception "protect[s] [the] autonomy [of religious institutions] with respect to internal management decisions that are essential to the institution's central mission." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020).

Plaintiff-schools and the teachers those schools employ about whether a virtual learning model is an appropriate model of instruction. Rather, it involves the authority of the State to regulate a parochial school in the same manner it regulates a secular school. The Free Exercise Clause does not prohibit such regulations so long as the regulation does not overtly or covertly target religious conduct for discriminatory treatment. *Lukumi*, 508 U.S. at 534.

Plaintiffs also argue strict scrutiny applies to a neutral and generally applicable law where that law burdens religion <u>and</u> another constitutionally protected right, such as the right of parents to direct the education of their children. (Doc. No. 7 at 2-3 (quoting *Smith*, 494 U.S. at 881)). Plaintiffs did not allege a violation of this fundamental right in their complaint and did not mention it in their briefing until raising it for the first time in their reply brief. Plaintiffs also have not identified any case in which a court has held a school closure order like the one at issue in this case implicates a parent's right to direct a child's education. *See Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925) ("The fundamental theory of liberty . . . excludes any general power of the state to standardize its children by forcing them to accept instruction from public teachers only."). Nor has my research uncovered any.

Further, Plaintiffs do not explain how a temporary prohibition on in-person instruction on grades 7 (or 9) through 12 at all schools in Lucas County directly and substantially interferes with this parental right. *See St. Joan Antida High Sch. Inc. v. Milwaukee Pub. Sch. Dist.*, 919 F.3d 1003, 1009 (7th Cir. 2019). In that case, the Seventh Circuit ruled that a busing policy which caused some families not to send their children to the plaintiff school did not constitute a direct and substantial burden on parental rights. *Id.* By contrast, Plaintiffs offer only a passing reference to an alleged burden on parental rights. Even if I consider Plaintiffs' late submission, they fail to show the conclusory assertion of the violation of a parent's right to direct a child's education is sufficient to trigger strict scrutiny.

Plaintiffs also argue the TLCHD Resolution violates the First Amendment because it treats students in grades kindergarten through 6 differently than students in grades 7 through 12. (Doc. No. 2 at 13). Plaintiffs do not identify the alleged infringement on the Free Exercise Clause this distinction creates. Moreover, Plaintiffs' disagreement with the TLCHD's policy decision does not amount to a demonstration that that policy lacks a rational basis. The TLCHD Resolution specifically cites data indicating "the rate of infection is twice as high in children aged 12-17 years as it is among 5-11-year-olds . . . [and that] those in grades 7 through 12 do have a greater potential to spread COVID due to the way classes are structured (moving from class to class) . . . ." (Doc. No. 1-3 at 2).

Finally, Plaintiffs also point to the actions, omissions, and comments of other state and federal governmental offices to challenge the wisdom of TLCHD's Resolution. They contend TLCHD has overreached because Ohio Governor Mike DeWine has not ordered schools to close despite "continually express[ing] concern about community spread," and that the Ohio State Board of Education and the Centers for Disease Control have not recommended schools be closed in order to limit community spread. (Doc. No. 1 at 6-7). As I noted above, however, Plaintiffs do not contend that the TLCHD lacks the authority to order schools to close.

### V.   CONCLUSION

While Plaintiffs' frustration with the school-closure order no doubt is genuine, the terms of the TLCHD Resolution apply as equally to Plaintiffs as they do to public schools in Lucas County which also continued to offer in-person instruction until the TLCHD Resolution compelled those schools to switch to a virtual learning model as well. I conclude Plaintiffs are unlikely to succeed on their claims and that the "unlikelihood of success on the merits is determinative" of Plaintiffs' motion for a temporary restraining order. *Commonwealth v. Beshear*, 2020 WL 7017858, at *4.

For the reasons stated above, I deny Plaintiffs' motion for a temporary restraining order. (Doc. No. 2).

No later than December 16, 2020, the parties shall submit a joint status report to my chambers via email regarding the next steps concerning Plaintiffs' motion for a preliminary injunction, including a proposed timeline for any pre-hearing briefing and the need for limited discovery prior to a hearing on Plaintiff's preliminary injunction request.

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge
